MONROE, C. J.
Defendant prosecutes this appeal from a judgment declaring paid and canceled (by the tender, and the deposit in the registry of the district court, of $19,000) plaintiff’s note for $30,000, upon which there appears a credit of $11,000, theretofore paid on account, and ordering defendant to surrender the note, together with 200 shares of the stock of the Schwing Lumber & Shingle Company, Limited, pledged for its payment. Plaintiff answers the appeal, praying that the judgment be amended by allowing it damages, as claimed in the original petition, in the sum of $5,000, alleged to have been sustained by reason of the protest of the note, after tender of payment.
It appears that plaintiff borrowed $30,000 from. defendant, for which it gave the note thus mentioned, executed by it on June 13, 1911, made payable to the order of defendant, on December 17, 1911, with interest from maturity, indorsed in blank by J. M. Dresser, plaintiff’s then president, and further secured by the pledge of 200 shares of the stock of the Schwing Lumber & Shingle Company, Limited, and 1,000 shares of the stock of the Suburban Realty Company; that, at or before the maturity of the note, the stock of the realty company was sold, and the proceeds, amounting to $11,000, applied in part payment thereof, leaving due the balance of $19,000, of which plaintiff made tender, coupled with a demand ipr the surrender of the stock of the lumber company, which action, upon the refusal of defendant to surrender the stock, was followed by the institution of this suit, the issuance of writs of injunction and sequestration, and the deposit in court of the $19,000. The note reads, in part, as follows:
“$30,000. New Orleans, June 13, 1911.
“December 17, after date, we, signers, indorsers, sureties, and all of us, in solido, promise to pay to the order of Hibernia Bank & Trust Company, at their office, in New Orleans, Louisiana, thirty thousand no/100 dollars, for value received, with interest thereon, at the rate of 8 per cent, per ann.um from maturity until paid. This note is secured by pledge and delivery of the securities mentioned on the reverse hereof. Should said securities decline in value, the maker of this note hereby agrees, within twenty-four hours from demand on him to that effect, to furnish and pledge additional securities, satisfactory to the holder of this note, to cover such decline. And the failure or refusal by the maker to furnish such additional securities, when so called for, shall at once mature this note and pledge.
“Should this note not be paid at maturity, * * the then holder thereof is hereby authorized to sell the pledged securities * * * and * * * to transfer any shares of stock * * * on the books of the company issuing the same. * * * The proceeds of the sale of the pledged securities shall be applied: (1) To the pajnnent of all costs and commissions for selling ; (2) to the payment of this note, in principal and interest, and the 5 per cent, attorney’s fees below stipulated; and (3) to the payment of any other indebtedness, then due or thereafter to become due, by the maker of this note to the said Hibernia Bank & Trust Company, to the-sum of $250,000. * * The securities pledged with this note are also pledged to secure any other obligation of the maker or makers, due or hereafter to become due to the Hibernia Bank & Trust Company.”
“[Signed] J. M. Dresser Co., Ltd.,
“By. J. M. Dresser, Prest.”
Upon the reverse there appear: The indorsement, in blank, of J. M. Dresser; a memorandum of the securities pledged; and a credit of $11,000, -resulting from the sale of the stock of the realty company.
It further appears that defendant holds, another note, similar in terms to that above quoted, but for $60,000, drawn by the Southern Gravel & Material Company, through J. M. Dresser, president, and indorsed by Dresser individually, which is past-due and unpaid, and upon which there appears a pros *317 pect of loss; and defendant, in its answer, gives its reasons for refusing to surrender the stock pledged for the security of the $30,000 note as follows:
“That, under the terms of the said $30,000 note of the J. M. Dresser Company, Limited, it is provided that the ‘securities pledged with this note are also pledged to secure any other obligations of the maker or makers due or hereafter to become due to the Hibernia Bank & Trust Company’; ® ,® ® that, under the terms of said note of the Dresser Company, Limited, * * s= and tlaat of the Southern Gravel & Material Company, * * * it is provided * * * ‘that we, the signers, indorsers, sureties, and all of us, in solido,’ bind and obligate ourselves to the conditions stipulated in said notes, and the said J. M. Dresser is, under the law, a comaker and co-obligor in solido, as being i such signer, indorser, surety, and maker. * * * Now, your respondent avers that the 200 shares of the Sehwing Lumber & Shingle Company which were deposited in pledge * * * to secure the $30,000 note * * * were, and are, the property of J. M. Dresser individually, and [were] deposited by him, as comaker with said J. M. Dresser Company, Limited, as security for the payment of said note, and said 200 shares were in no sense the property of the said J. M. Dresser Company, Limited, and that, under the law and under the terms of the two respective notes of $30,000 and $60,000, the said securities — to wit, the 200 shares of the .Sehwing Lumber & Shingle Company — were also pledged to secure the payment, by the said J. M. Dresser, as comaker in solido, of the $60,000 note subscribed by the said Southern Gravel & Material Company.”
The evidence does not sustain the allegation that the 200 shares of stock in controversy belongs to J. M. Dresser,' or that they belonged to him when either of the notes which have' been mentioned was executed, but shows that, although he had owned the shares for several years, and, during part of that time, being plaintiff’s president, had used them as collateral in borrowing money for plaintiff, he had, on March 29, 1909, conveyed them to plaintiff, for a valuable consideration, and that plaintiff has since then been the sole owner, and has enjoyed the exclusive use of them. The inquiry in the district court concerning the ownership of the stock and the manner and effect of its use, in so far as defendant is concerned, extended over a wide range, and a consideration in detail of all the facts developed would be unprofitable, Those which appear to us to have the more material bearing upon, the result may. be stated as follows: Edward Wisner and J. M. Dresser were, for a number of years, engaged in business together, under the firm name of Wisner & Dresser. The general character of the business, we infer, was the purchase, development, and sale of lands, and we also infer that the business was carried on rather through the medium of corporations promoted by them than by the partnership itself or its members. The partnership was eventually dissolved, and Dresser appears thereafter to have conducted his business mainly through corporations established by him, and referred to in this case as “Dresser Corporations” ; the amount of business done by him individually, and with the defendant, having been, so far as this record discloses, comparatively inconsiderable. The plaintiff corporation was established on June 25, 1907, with a declared capital of $100,000, of which M. A. Dresser subscribed for $80,000, J. M. Dresser for $10,000, and M. S. Dresser for $10,000; M. A. and M. S. Dresser being this daughters of J. M. Dresser, and J. M. Dresser being the president of the company, and the two young ladies occupying the offices of vice president and secretary-treasurer, respectively. So far as we are informed, J. M. Dresser was not indebted to defendant or to any one else at that time, and his deposit book (with defendant) showed credit balances June 4, 1907, $7,29-4.48; July 1st, $3,-885.17; July 31st, $9,622.53.
The business, other than that of depositing money and drawing checks, which was thereafter transacted between the company (represented always by “J. M. Dresser, president”) ahd defendant, and between J. M. Dresser individually and defendant (with which plaintiff was connected), appears to have consisted of the discounting and payment or renewal of the following notes, all of them having ultimately been paid, with the *319 exception of the balance of $19,000 on the note for $30,000, which is here in controversy, to wit:
Note of company, June 9, 1908, $10,000, hearing on back the legend:
“Schwing Lumber & Shingle' Co., Ltd., ctfs. Nos. 18 & 46 for 50 shares each.
“Collateral with this note.
“[Signed] J. M. Dresser.”
Note of company, June 18, 1908, $5,000, bearing on back:
“Secured by certif. No. 45 for 50 shares Schwing Lumber & Shingle Co., Ltd.
“[Signed] J. M. Dresser.”
Note of J. M. Dresser, July 25, 190S, $21,-000, bearing on back:
“50 shares of Schwing Lumber & Shingle Co., Ltd., stock.
“1,000 shares of Suburban Realty Co., Ltd., stock.
“$9,724.91 vendor’s lien note, given by Prairie Lands Co., of La. * * * All of above collateral on the within note.
“[Signed] J. M. Dresser.”
Following which there appear credits from payments made in October and November, 1908, amounting to $19,175.
Note of company, September 16, 1908, $5,-000, bearing on back:
“50 shares of stock of Atchafalaya Land Co., Ltd., collateral to this note.
“[Signed] J. M. Dresser.
“J. M. Dresser.”
Note of company, December 2, 1908, $50,-000 bearing on back:
“200 shares Schwing Lumber & Shingle Co.
“1,000 shares Suburban Realty Co.
“50 shares Atchafalaya Land Co.
“Mtge. note Prairie Lands Co. of La.,
Ltd. * * * [Signed] J. M. Dresser.
“J. M. Dresser.”
Note of company, June 2, 1909, $50,000, bearing on back:
“Secured by 300 shares Schwing Lumber & S. Co.
“Secured by 1,000 shares Suburban Realty Co.
“Secured by 50 shares Atchafalaya Land Co.
“Mtge. note Prairie Lands Co. of La., Ltd. * * *
“250 shares Graham Island Lumber Co., Ltd., stock.
“[Signed] J. M. Dresser Co., Ltd.,
“By J. M. Dresser, Prest..
“J. M. Dresser.”
Note of company, December 2, 1909, $50,000, bearing on back:
“[Signed] J. M. Dresser.
“Secured by 200 shares Schwing Lumber & Shingle Co. certs.
50 50 50 25 25
18 45 46 47 48
“1,000 shrs. Suburban Realty Co. 500 sh.
116
500 sh.
117
“50 shrs. Atchafalaya Land Co. cost 50 sh.
1
“Mtg. note Prairie Lands Co. of La., Ltd., * * * $9,724.91.
“5 notes, $9,000 each, and each secured by 50 shares Graham Island Lbr. Co., made by D. E. Sharpe. * * *
“[Signed] J. M. Dresser Co., Ltd.,
“By J. M. Dresser, Pres.”
Note of company, November 25, 1910, $50,000, bearing on back:
“[Signed] J. M. Dresser.
“Secured by 200 shares Schwing Lbr. Shin. Co.
“Secured by 1,000 shares Suburban Realty Co.
“Secured by 50 shares Atchafalaya Land Co.
“2 notes St. Bernard Land Co., @ $4,938 each.
“5 notes D. E. Sharpe, $9,000 each, 50 shares Graham Island.
“Notes attached to each.
“[Signed] J. M. Dresser Co., Ltd.,
“By J. M. Dresser, Pres.
“Paid on account, Dec. 17, 1910, $49,900.00, proceeds of”—
Note of company, December 17, 1910, $30,000, bearing on back:
“[Signed] J. M. Dresser.
“Secured by 200 shares Schwing Lbr. & Shingle Co.
“Secured by 1,000 shares Suburban Realty Co.”
Note of company, June 13, 1911, • $30,000, bearing on back:
“Secured by 200 shares Schwing Lbr. and Shingle Co.
“Secured by 1,000 shares Suburban Realty Co.
“[Signed] J. M. Dresser.
“12/18/11 Paid on % $11,000.00.”
Tbe 200 shares of stock that are in dispute are represented by certificates Nos. 47 and 48, for 25 shares each, and Nos. 18, 45, and 46, for 50 shares each. They were all issued and *321 belonged originally to J. M. Dresser, but, for the purposes of the different pledges for loans obtained by Mm as president of the plaintiff company, he executed, in blank, the usual irrevocable power of attorney, authorizing the transfer which appears upon the back of each certificate, and they still remain in that condition; no transfers having been entered on the books of the company, for the reason that, when the stock was conveyed to plaintiff, the certificates were held in pledge by defendant, and it would have been a matter of some inconvenience to have withdrawn them in order that others might be issued. The conveyance to plaintiff was effected by means of a proposition submitted to its board of directors by J. M. Dresser, accepted by the board on March 29, 1909, and ratified by the stockholders at a meeting held on the following day; and thereafter, on the same day (March 30th), in compliance with a written request that had been addressed to it by defendant on March 15th, plaintiff furnished defendant with a detailed statement of its affairs, which showed the stock which had been thus acquired among its assets; that is to say, it contained, in the list of its assets an item reading:
“Schwing Lumber & Shingle Co. stock .........................$20,000.00”
—which is otherwise shown to have referred to the 200 shares that the company had just acquired, at a valuation of $130 per share. Mr. Dresser testifies that he went over the statement with Mr. Pool, the vice president of the defendant bank, and told him that the item in question referred to the 200 shares of stock that the bank then held in pledge. He says:
“I remember it just as perfectly as though it were yesterday.”
Mr. Pool was unable to recall the conversation, but does not say that it did not occur, and he gives certain reasons why, as it appears to us, he would not be likely to recall a reference to a particular item, upon one statement of the many that were brought to his attention, where as in this ease, the statement, as a whole, appeared to be satisfactory. Thus he says:
“I would not send for a statement like that and go over every line. I ask if the values are correct, and I pass those up, feeling that the concern is in liquid shape; that is the reason for that, and that is the attention that is paid to them in the average bank. * * * I only glanced over the statement for the purpose of determining whether the concern was in good condition. I probably never noticed that particular entry or saw it on there. I know that I saw the statement, because I had a memorandum showing that we had got it, and from the fact that it has an initial on it I know that I saw it.”
Other circumstances developed by the testimony and bearing upon the question of the verity and good faith of the conveyance to plaintiff of the stock in question are as follows:
Upon the back of each of the first two of the notes executed by the company and discounted by defendant the signature of J. M. Dresser appears but once, immediately underneath the memorandum showing the pledge of the collateral, leaving it doubtful (particularly when the notes referred to are compared with those subsequently executed) whether the intention was that he should do more than consent to the pledge of securities which belonged to him. That it was considered that the consent to the pledge and the consent to the indorsement of the notes should be evidenced by separate signatures appears from the fact that the note of $21,-000, made by J. M. Dresser individually, to the order of defendant, bears his signature to the pledge memorandum upon its back, as well as to the obligation to pay, expressed upon its face; and the company’s two notes of September 16 and December 2, 1908, for which Dresser’s securities were pledged, bear, each, two of his signatures, the one (no doubt) as indorser or surety, and other apparently jis pledgor of the collateral. *323 Again, on the note for $50,000 of June 2, 1909, being the first that was given by the company after its acquisition of the Schwing 'Company stock, it will be seen that the company (“By J. M. Dresser, Pres.”) signs (apparently) as pledgor, as well as maker, and that the signature of J. M. Dresser follows that to the pledge, and so, in effect, with the notes of December 2, 1909, and November 25, 1910; . and on the note of December 17, 1910, the signature “J. M. Dresser” appears above the pledge memorandum, and not otherwise, that memorandum being unsigned. . The question which suggests itself, then, is: Why, and at whose instance, was the pledge memorandum signed by (or in the name of) the company for the first time upon the note that was executed next after its acquisition of the pledged securities which are now in dispute, if it was not because the company was then recognized as the owner of those securities?
Another question which is suggested is: In what way is the,verity and good faith of the conveyance to plaintiff of the Schwing Company stock, on March 29, 1909, affected by the fact that Dresser failed to pay the gravel company note for $60,000, which was executed two years after that conveyance (March, 1911), and which matured and was dishonored three years later (March, 1912)? Save for his obligation on plaintiff’s note of December 2, 1908, Dresser, at the date of the conveyance, owed defendant nothing, and, so far as the record shows, was in debt to no one else, and it is not easy to understand what reason defendant could have found for complaining of the transfer to the maker of a note held by it of the collateral security which it also held in pledge to secure the payment of the note. Again, Dresser conveyed the stock to plaintiff for a valuable consideration, and it is neither alleged nor proved that he did not receive a fair equivalent, or that he became any the poorer by reason of the transaction. The proposition that he made, and that plaintiff accepted, was to convey the stock (200 shares, at a valuation of $130 per share) for $26,000, and to assume the payment of notes (of the plaintiff# as we assume) to the amount of $47,500, and that, in exchange therefor, plaintiff should cancel his note for $52,191.65, and surrender the collaterals at-, tached thereto, cancel his note for $5,000, and surrender the collaterals attached thereto, and credit his account with $16,408.35, all of which, as we understand, was done. And, as it is conceded that plaintiff was, and is, a perfectly solvent corporation, the credit of $16,408.35 was a good asset.
■ It is argued that the $30,000 note here involved was given in renewal of the obligation represented by the preceding notes, and that, as the stock in question had been pledged, as the property, of Dresser, to secure his note of $21,000, its status could not be changed so long as the note, or those given in renewal of it, remained unpaid. The facts, as shown by the evidence, are: -That only 50 shares of the Schwing Company stock were pledged to secure the note of $21,000; that payments were made on that note prior to December 2, 1908, leaving a balance due of something over $1,200, which was included in the note of $50,000 given by the company on the date last above mentioned; that the note of that date was taken up by the note for $50,000 of June 2, 1909, which was taken up by the n'ote of December 2, 1909, which was taken up by the note of November 25, 1910, which was paid on December 17, 1910. The copy of the note last mentioned that we find in the record. shows that it was well secured by collateral, included in which were five notes of D. E. Sharpe, for $9,000 each, which were paid, and the note shows a payment on account of $49,960. According to 'the oral testimony, those figures should perhaps be $45,960; but, in any event, it *325 appears that the proceeds of the five Sharpe notes, of $9,000 each, were placed to the credit of plaintiff’s checking account, thereby increasing the balance to the credit of that account to an amount exceeding by several thousands of dollars the $50,000 called for by plaintiff’s note, which had not then matured, and plaintiff thereupon gave its check in payment of that note, and the check drawn to the order of defendant, and paid and canceled by it, is in the record. If the check had been paid from the proceeds of the $30,000 note of December 17, 1910, and not from other funds-of the plaintiff, it would have been easy for defendant to show it, but no attempt was made to do so, and we take it as proved that the continuity of the renewals was broken by that payment, and that the discount of the $30,000 note was an independent transaction, wholly disconnected from those which had preceded, save that some of the same securities were used as collateral.
We repeat, then, that the evidence does sustain defendant’s allegation that the stock here claimed by it belongs to J. M. Dresser, or that it belonged to him when the note of $30,000 with which it was pledged was executed, but shows that it has belonged to plaintiff since March 29, 1909, and has never since that date been pledged to defendant to secure any debt due by Dresser, save in so far as plaintiff’s notes, bearing his signature as indorser, surety, or what not, may be considered to have been his debts. Defendant’s further, and perhaps main, contention is that Dresser is, in legal contemplation, one of the makers of the $30,000 note to secure the payment of which the stock in question was pledged, and that, whether he or plaintiff owns or owned the stock, it falls within those provisions of the note which read:
“We, signers, indorsers, sureties, and all of us, in solido, promise to pay. * * * The proceeds of the sale of the pledged securities shall be applied * * * (3) to the payment of any other indebtedness then due or thereafter to become due by the maker of this note * * * up to the sum of $250,000. * * * The securities pledged with this note are also pledged to secure any other obligation of the maker or makers due or hereafter to become due to the Hibernia Bank & Trust Company.”
The form upon which the note is made was evidently prepared by defendant, and the foregoing is an excerpt from certain printed matter which appears upon the face of it. The construction of the instrument must, therefore, in case of doubt, be favorable to plaintiff and unfavorable to defendant. The proposition that, where two persons unite in making, a note, and one of them pledges collaterals belonging to him to secure its payment, such collaterals become thereby ipso facto pledged for the security, not only of all other debts due and to become due of the pledgor, but also for all other debts due and to become due of his comaker, is not altogether easy of digestion, though, if parties choose to make contracts to that effect, they may perhaps be enforced, but the courts would probably be careful to find that they were susceptible of no other construction. And a fortiori is that true where, as here, the proposition is that securities belonging to the maker of a note, and pledged by him to secure its payment, are thereby also pledged to secure, not only all other debts that he may then or thereafter owe the payee, but to secure all other debts which any'indorser, surety, or other party whose name appears on the note may then or thereafter owe to such payee.
Bearing in mind the rule of construction which has been stated, and by which we think we should be governed (if there should arise a doubt requiring its application), it will be observed that, while the obligation to pay the note here in question is imposed, in terms, upon “signers, indorsers, sureties, and all * * * fia solido,” the obligation with respect to the debts for which the se *327 curities attached to the note stand pledged is also, in terms, confined in its application to the debts of the maker or makers, and, plainly, it cannot be extended to the debts of other parties. We are of opinion, then, that the name of J. M. Dresser does not appear upon the note as that of a maker, either within the contemplation of the contract represented by t^e note or within the contemplation of the law of this state. The language of the note which has been quoted contains a recognition of the fact that, though all the parties whose names appear upon it bind themselves in solido for its payment, there may nevertheless be indorsers, sureties, etc., as well as makers, and provides for the application of the proceeds of the pledged securities only to the payment of the debts, other than that represented by the note itself, of the maker or makers. If the “Negotiable Instruments Act” be applied to the case, Dresser’s status is that of indorser, though, by having promised in solido with all the other parties and unconditionally to pay, he may have deprived himself of some of the rights of an indorser. Act No. 64 of 1904, § 63, p. 157. If that act be regarded as inapplicable, then, under our jurisprudence as it existed prior to its adoption, his status was that of surety. McCausland v. Lyons, 4 La. Ann. 273; Rogers & Woodall v. Gibbs, 24 La. Ann. 467; Claflin Co. v. Feibelman, 44 La. Ann. 523, 10 South. 862; Bank v. Brewing Association, 49 La. Ann. 943, 22 South. 48.
We are asked, upon the one hand, to amend the judgment appealed from, by awarding plaintiff damages, and, upon the other hand, to reverse the judgment and remand the case, in order that defendant may derive some possible advantage from the trial of other cases that are said to be pending against Mr. Dresser or some of his companies. We find no sufficient reason for granting either request.
Judgment affirmed.